UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,

     -v-

MIKHAIL ZEMLYANSKY, et al.,

       *Defendants,*

YURIY ZAYONTS,
MIKHAIL KREMERMAN,
VLADISLAV ZARETSKIY,

       *Defendants-Movants.*

---------------------------------------------------------X

No. 12 Cr. 171 (JPO)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' APPLICATION FOR <u>MODIFICATION OF BAIL</u>

HAFETZ NECHELES & ROCCO

Frederick P. Hafetz
Noah E. Shelanski
Attorneys for Defendant
*Yuriy Zayonts*

COOLEY LLP

Jonathan Bach
Michael Blasie
Attorneys for Defendant
*Mikhail Kremerman*

CLAYMAN & ROSENBERG LLP

Henry Mazurek
Attorney for Defendant
*Vladislav Zaretskiy*

## PRELIMINARY STATEMENT

Defendants Yuriy Zayonts, Mikhail Kremerman and Vladislav Zaretskiy respectfully submit this memorandum in support of their motion for modification of their bail conditions, specifically to eliminate the condition of home detention with electronic monitoring.  This is in effect their initial bail application.  Upon their arrest nearly five months ago on February 29, 2012, their then attorneys consented to the present bail conditions to obtain their release from custody.  No factual presentation was made on their behalf at that time.  The Pretrial Services Office conducted thorough interviews of each individual and analyzed their respective circumstances.  It recommended that each be released on personal recognizance bonds, executed by appropriate co-signors – without recommending either home confinement or electronic monitoring as a condition of pretrial release.  Presenting a bail argument now for the first time on behalf of these individuals, we urge the Court to adopt the approach recommended by Pretrial Services.

As set forth in detail below, these individuals pose no risk of danger to the community and no risk of flight.  The government's argument for home detention boils down to the proposition that these defendants (1) are foreign born, and (2) face the possibility of a high guidelines sentence.[1]  This argument, taken to its logical extreme, means that any foreign-born individual, even a United States citizen, should be denied his or her liberty when charged with a significant financial fraud, even without any further factual showing.  This argument does violence to the Bail Reform Act.

Messrs. Zayonts, Kremerman and Zaretskiy all enjoy unblemished records.  They have resided in and been citizens of the United States for decades.  Three generations of their families

---

[1] The government's argument was presented in a written Motion for Detention submitted at the time of defendants' arrest and provided to their former counsel. We attach that Motion to this memorandum as Exhibit 1.

now live in the New York area, including their parents and children. Just as significantly, they have no ties to the Ukraine – no relatives, no assets or property – their birthplace of many years ago. There is no basis whatsoever for the unnecessary and punitive condition of home confinement with electronic monitoring. The government has wielded a meat ax rather than a scalpel in fashioning the "least restrictive condition, or combination of conditions of pre-trial release" under the Bail Reform Act. 18 U.S.C § 3142 (c)(1)(B). Indeed, in *United States v. Chervin,* 10 Cr. 919 (S.D.N.Y), a recent case in this district presenting nearly identical circumstances, including numerous foreign-born defendants accused of defrauding insurance companies for amounts in excess of $100 million, Judge Patterson did not impose either home detention or electronic monitoring as a condition of pretrial release, except with respect to two defendants who were demonstrably linked to physical violence and guns.

   The imposition of home detention with electronic monitoring should be reserved for those cases and defendants whose circumstances evince a heightened risk of flight and real danger to the community. It represents an extraordinary condition of release, qualitatively different from the historical "standard" conditions of release – such as not committing crimes while on bail, reporting changes in address or telephone number, or making all future court appearances. Judge Weinstein has opined that "[r]equired wearing of an electronic bracelet, every minute of the day, with the government capable of tracking a person not yet convicted as if he were a feral animal would be considered a serious limitation on freedom by most liberty-loving Americans." *United States v. Polouizzi*, 697 F.Supp. 2d 381, 389 (E.D.N.Y. 2010) (finding the imposition of mandatory home detention and electronic monitoring as a condition of bail to violate the Eighth Amendment's proscription against "excessive" bails in a case charging child pornography offenses). In this case, given these defendants' substantial ties to the

community and the absence of any threat of physical violence, home confinement and electronic monitoring are conditions not narrowly tailored to reasonably assure these defendants' future appearances in court and the safety of the community.

Accordingly, we respectfully request that this unnecessary condition be removed. Their remaining bail conditions, when combined with the requirement of strict pretrial supervision, will be sufficient to reasonably assure their appearance in court. Such conditions more fairly represent the "least restrictive . . . combination of conditions" of pretrial release mandated by the bail statute.

## FACTUAL BACKGROUND

### A.    The Indictment

Yuriy Zayonts, Mikhail Kremerman, and Vladislav Zaretskiy are three of 36 defendants charged in a four-count indictment alleging four conspiracies, including racketeering, health care fraud, mail fraud, and money laundering.[2]   These offenses all arise out of the operation of medical clinics in New York State, which were established to treat the victims of automobile accidents.   The government claims that the defendants conspired to provide medically unnecessary services, which were billed to insurance companies.   The government further alleges that these clinics were owned or controlled by non-medically licensed professionals, contrary to New York law.

For purposes of this motion, the defendants concede that the Indictment includes serious felony charges – a fact which does not distinguish it from almost all of the federal felony indictments brought in this district.   Notably, however, the charges all claim violations of

---

[2] Vladislav Zaretskiy is not charged in the racketeering conspiracy in Count One.   He is charged in the health care, mail fraud and money laundering conspiracies in Counts Two through Four.   Also, the government did not seek Mr. Zaretskiy's pretrial detention at his initial appearance, which it did against most of the RICO defendants.

financial crimes.  There are no allegations of violence in the Indictment and none of the charges

creates any presumptions under the Bail Reform Act.  *See* 18 U.S.C. § 31429(f)(1).

**B.      Current Bail Conditions**

As noted, none of the three defendants presenting this bail modification request had a

contested bail hearing.  All three of these defendants consented to a bail package when they were

represented by prior counsel.  Their current conditions of release are as follows:

(1) Personal Recongizance Bond

    a.  $2.5 million Personal Recognizance Bond ("PRB") co-signed by three financially

        responsible persons secured by $50,000 (cash) and $250,000 in property equity

        for Mr. Zayonts and Mr. Kremerman;

    b.  $2,000,000 PRB co-signed by two financially responsible persons and secured by

        $50,000 cash or property for Mr. Zaretskiy;

(2) travel restricted to the Southern and Eastern Districts of New York;

(3) surrender of all travel documents (and no new applications);

(4) strict pretrial supervision;

(5) drug testing and treatment (as needed) for Mr. Zayonts and Mr. Kremerman;

(6) home detention with electronic monitoring;

(7) no new work or business related to medical clinics;

(8) no opening of new financial credit accounts without prior notice and approval by

 Pretrial Services for Mr. Zayonts and Mr. Kremerman and;

(9)  no contact with co-defendants except for family obligations and co-defendant

meetings for Mr. Zayonts and Mr. Kremerman

## LEGAL STANDARDS AND AUTHORITY

### A.    The Bail Reform Act

The Bail Reform Act of 1984 prescribes in significant detail the bail process and

standards, including the form of hearing and process due an accused, the creation of

presumptions for certain cases (none of which are applicable here), the specific standards by

which detention and conditions of release are determined, the allocation of burdens of proof, and

the reaffirmation of an accused's presumption of innocence throughout the bail process. 18

U.S.C. 3142 *et seq.; see also United States v. Salerno*, 481 U.S. 739, 747 (1987) (affirming

constitutionality of Bail Reform Act).

More specifically, the Bail Reform Act requires courts to release defendants before trial

subject to "the least restrictive" condition or set of conditions that "will reasonably assure the

appearance of the person as required and the safety of any other person and the community." 18

U.S.C. § 3142(c)(1)(B).  The statute then lists thirteen categories of conditions that may be

imposed, plus a catch-all category of "any other condition that is reasonably necessary" to satisfy

the aforementioned joint objectives of bail. *Id.* at § 3142(c)(1)(B)(xiv).  None of the enumerated

conditions in the statute contain a provision for home detention with electronic monitoring. This

condition is a relatively new addition to federal bail.  It is imposed under the "catch-all"

provision in the Act.  The Eighth Amendment provides that "[e]xcessive bail shall not be

required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," U.S. Const.

Amend. VIII. *Salerno* broadly states that the "substantive limitation of the Bail Clause is that the

Government's proposed *conditions of release* or detention not be 'excessive' in light of the perceived evil." *Salerno*, 481 U.S. at 754 (emphasis added).

**B.    Recent Precedent in This District, in *United States v. Chervin*, No. 10 Cr. 918 (S.D.N.Y.) (Patterson, J.), Supports Bail Without the Intrusive Restraints of Home Detention and Electronic Monitoring**

Directly supporting defendants' application for eliminating the condition of home confinement with electronic monitoring is Judge Patterson's recent decision in *United States v. Chervin*, 10 Cr. 919 (S.D.N.Y.). Exhibit 2 (Indictment). *Chervin* involved circumstances virtually identical to those present here – numerous foreign born defendants facing potentially high guideline sentences for alleged offenses involving the defrauding of insurance companies through the submission of claims for allegedly unnecessary services.

In that case, this same prosecuting office filed an Indictment against 18 defendants, alleging many of the same offenses charged here.  The indictment charged:

> Patients were provided medical treatment, including painful nerve-conduction examinations, without reference to their actual medical need.  After insurance companies paid for these unnecessary medical costs, the fraud proceeds were laundered through multiple counts, including the escrow account belonging to an attorney. *Id.*

In its press release announcing the Indictment, the government claimed that the fraud amount was $100 million. See Press Release Exhibit 3.

Significantly, unlike the present case, the alleged fraud in *Chervin* was claimed to be carried out by allegedly "violent" organized crime gangs "for at least a decade." *Id.*

Of the 18 defendants arrested in *Chervin*, 16 had bail conditions that did not include home detention or electronic monitoring.  *See Chervin* Bail Conditions Chart (extracted from ECF public docket report), at Exhibit 4.  Of the two remaining defendants, Robert Terdjanian was detained without bail, but notably he had been charged in a separate indictment with violent

offenses and was the alleged leader of a violent organized crime organization. *See United States v. Armen Kazarian, et al.*, 10 Cr. 895 (Gardephe, J.).  Exhibit 5.  As to the other remaining *Chervin* defendant, Aron Chervin (also simultaneously named as a defendant in the *Kazarian* indictment), Judge Patterson initially imposed home confinement with electronic monitoring after finding dangerousness based upon a federal agent's discovery of firearms and ammunition in Chervin's home at the time of his arrest.  Yet, notwithstanding this initial finding of dangerousness, five months later, upon Chervin's application for modification of his bail, Judge Patterson eliminated the condition of home confinement with electronic monitoring.  *See Chervin*, No. 10 Cr. 918 (RPP), Dkt. No. 214 (4/15/2011).

The imposition of home detention with electronic monitoring against Messrs. Zayonts, Kremerman and Zaretskiy – in a case involving no allegations of violence but similar in all other respects to *Chervin* – is directly contrary to this recent precedent in this district.  *See also Diunov v. United States*, No. 08 Civ. 3184 (KMW), 2010 WL 2483985, at *2 (S.D.N.Y. June 16, 2010) (Wood, J.) (Magistrate Judge denied government's request for electronic monitoring as condition of release in case where defendant was non-citizen who had only temporary visa status in United States, had significant family ties in her home country of Israel, and already had pled guilty to a $1.7 million fraud).

### C.   The Government Cannot Show Any "Economic Danger" To The Community From Defendants And Home Detention Is Not A Condition That Ameliorates Such A Risk Even If It Were to Exist

The Second Circuit has not endorsed the position that "economic harm" should be considered in evaluating danger to the community under the Bail Reform Act.  While courts clearly have considered the concern about nonphysical harm to the community where the charges fall under the enumerated felonies articulated in 18 U.S.C. § 3142(f)(1), such as child

7

pornography or drug trafficking offenses, *see e.g. United States v. Zaragoza*, 2008 WL 686825, at *3 (N.D. Cal. Mar. 11, 2008), *United States v. Schenberger*, 498 F.Supp.2d 738, 742 (D.N.J. 2007), there is scant authority supporting the theory that a court should consider a defendant's propensity to commit further economic crimes as the danger to the community contemplated by the Bail Reform Act. This case certainly does not give the Court reason to take such an expansive view of this clause in the Act. *See e.g., United States v. Madoff*, 586 F.Supp.2d 240, 254 (S.D.N.Y. 2009) ("[I]t is far too great an extension to reach from the cases presented by the Government that narrowly recognize the possibility of economic harm (and rarely conclude the economic harm presented rises to the level of a danger to the community for which someone should be detained) to such a conclusion based on the minimal evidence presented here by the Government.").

The specific allegations in this indictment do not support a threat to the community of continued economic harm. The allegedly defrauded insurance companies are highly unlikely to be re-victimized. First, the government concedes that the alleged offending medical clinics have ceased operations. And, the extensive searches and seizures conducted by the government have eliminated defendants' ability to engage in the alleged offense activity. More importantly, however, insurance companies implicated here are not unsophisticated actors. They are enormous entities with tremendous resources and access to substantial legal support. These entities are not particularly vulnerable to future harm. Indeed, several insurance companies had already initiated civil actions in courts across New York regarding much of the same conduct alleged here *before* the government brought its indictment.

For these reasons, the issue of "danger to the community" should not be a concern to the Court in determining the "least restrictive" conditions of bail for these defendants.

**ARGUMENT**

**HOME DETENTION WITH ELECTRONIC MONITORING IS NOT THE "LEAST RESTRICTIVE" CONDITION OF RELEASE NECESSARY TO REASONABLY ASSURE THE FUTURE COURT APPEARANCES OF YURIY ZAYONTS, MIKHAIL KREMERMAN AND VLADISLAV ZARETSKIY AND PROTECT THE ECONOMIC SAFETY OF THE COMMUNITY**

The personal and family backgrounds of Messrs. Zayonts, Kremerman and Zaretskiy, their lack of criminal history, and their substantial ties to the New York community combine to prove that they are not a flight risk, and the government has failed to show any economic danger to the community under the circumstances presented here.

For the reasons that follow, the Court should grant their motion to remove the unnecessary and excessive condition of home detention. Notably, Pretrial Services also did not recommend home detention in its proposed conditions of release for Messrs. Zayonts, Kremerman and Zaretskiy. The Court should follow this recommendation.

**A. Yuriy Zayonts**

Mr. Zayonts' pre-trial release is conditioned on a significant bail package including a $2.5 Million personal recognizance bond secured by 3 co-signors and secured by $50,000 in cash and property possessing $250,000 in equity value. Mr. Zayonts' co-signors are his brother Leonid, family friend Diana Nabitovsky, and Marina Moroz, the woman with whom Yuriy Zayonts' father has lived following the death of Yuriy's mother in 2004. The $250,000 in property securing the bond was posted by his brother Leonid. This significant bond carries with it great moral suasion to assure that Mr. Zayonts complies with his bond conditions as Mr. Zayonts recognizes that his brother and the other co-signors risk losing their own homes if he fails to comply with his conditions of release. *See United States v. Vaccaro*, 51 F.3d 189 (9th Cir.

1995); *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Terrell*, 983 F.2d 653 (5th Cir. 1993); *United States v. Santiago*, 826 F.2d 499 (7th Cir. 1987); *United States v. Gigante*, 166 F.R.D. 3 (E.D.N.Y. 1996); *United States v. Gambino*, 809 F. Supp. 1048 (S.D.N.Y. 1992).

The significant bond and other conditions of Mr. Zayonts' pre-trial release are more than sufficient to accomplish the aims of the Bail Reform Act *without* the need for the conditions of home detention with electronic monitoring.[3]

As noted above, the Bail Reform Act requires the release of a defendant on the "**least restrictive**" conditions necessary to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(c)(1)(B) (emphasis added).  To determine the least restrictive conditions of release necessary to achieve the aims of the Bail Reform Act, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *see also U.S. v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007); *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993).  An analysis of these factors compels the conclusion that the significant bond and other conditions of Mr. Zayonts' pre-trial release are more than sufficient to accomplish the aims of the Bail Reform Act *without* the need for home detention with electronic monitoring.

---

[3] We note that since the initial imposition of the bail conditions the Court has allowed Mr. Zayonts to accompany his wife Irina to doctor appointments upon 48 hour notice to his Pre-Trial Services Officer provided that no other person was available to take her to these appointments. Also, in early April, 2012 Mr. Zayonts' Pre-Trial Services Officer granted him permission to work outside the home as a sales associate at a leasing company. His current work schedule is three days per week from 12pm to 5pm. He leaves his home at 11:15 and returns at 5:45 on the days he is working. Mr. Zayonts was also permitted by the Court to attend his younger son's graduation from middle school. (Dkt. No. 266).

1.  Nature and Circumstances of the Crimes Charged

In evaluating the "least restrictive" bail conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community," the Court must take into account: "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." *See* 18 U.S.C. § 3142(g)(1). It is clear from the statutory language that the primary consideration for the Court is whether the charged crime involved violence, narcotics, sex crimes, terrorism, and weapons.

Critical here to the Court's analysis of the "nature and circumstances of the crime charged," is that Mr. Zayonts has not been charged with any crime involving violence, sex trafficking, terrorism, minor children, narcotics, or weapons. Accordingly, there is nothing about the nature of circumstances of the offenses that Mr. Zayonts has been charged with that suggest that the severely restrictive conditions of home detention with electronic monitoring are necessary to achieve the purposes of the Bail Reform Act.


2.  Weight of the Evidence

The government will argue that its case against Mr. Zayonts is strong as a reason why electronic monitoring with home detention is a necessary bail condition. However, the allegations by the government against Mr. Zayonts will be sharply contested at trial. The work done by Mr. Zayonts' counsel thus far gives ample basis for belief that the charges are ill-founded. In any event, the strength of the government case is generally considered the "least important" of the 18 U.S.C. § 3142(g) factors for the court to consider when determining the conditions necessary to satisfy the aim of the Bail Reform Act. *See U.S. v. Jones*, 566 F. Supp.

2d 288, 292 (S.D.N.Y. 2008).

3.   History and Characteristics of Mr. Zayonts

The facts here concerning Mr. Zayonts' history and characteristics overwhelmingly establish that he is not a risk of flight.

Yuriy is 41 years old and has no prior criminal offense.  Born in the present day Ukraine when it was still part of the Soviet Union, he immigrated to the United States in 1992 with his wife Irina. Yuriy and Irina became citizens in 2000.  He and his wife have now spent more than half of their lives and virtually all of their adult lives in the United States.  Yuriy has been to the Ukraine only twice since he immigrated – three years ago to visit a friend there and once previously, fourteen years ago to visit a friend.  Neither he nor his wife have any family nor any known assets there.

Yuriy's and Irina's entire families emigrated from the Ukraine and all live in close proximity to the Staten Island home Yuriy and Irina in which they and their two children – Michael, age 19 and J.Z., age 13 – have resided for the last twelve years.  We attach to this memorandum a chart setting forth all of Yuriy's and Irina's relatives and where they live. (Exhibit 6).  The family members include Yuriy's only brother, Leonid, who pledged the home where he resides with his wife and child to secure the $2.5 million PRB for Yuriy and his father Mikhail whose long time girlfriend with whom he lives, Marina Moroz, pledged the home where she and Mikhail live to secure this PRB.

Upon arriving in Brooklyn where Irina and Yuriy first settled in 1992, he worked seven days a week at multiple jobs including for a dental laboratory and for a moving company to support his family living in an apartment which they shared with other family members.  Later,

he helped manage a bagel store in Manhattan which he and other family members started. Subsequently he worked at a billing collections firm and then worked for a company providing transportation for day care services.

Yuriy's entire family – three generations consisting of approximately two dozen persons – all live in New York City or close by. That family consists of his wife's parents, his father Mikhail and Marina Moroz, his two children, his brother and brother's family, aunts and uncles, nieces and nephews and cousins. In this extremely close knit family, Yuriy, as Marina Moroz states in her letter to the Court: "has always been the backbone of his large family." (Maria Moroz Letter, Exhibit 7).[4] The children in this large extended family including Yuriy's two children are first generation Americans. All of the rest of the family including Yuriy have been in the United States for fifteen years or more and are all United States citizens. Yuriy's entire life – family, friends and assets – are in the United States.

The letters to the Court make clear just how close knit this family is. Irina's elderly father who is stricken with throat cancer lives with Yuriy and Irina and requires much care from them. The letter from Yuriy's son Michael, now a college freshman in New York City, sets forth how deeply involved Yuriy is in the activities of Michael and his younger brother J.Z., age 13, now a freshman at Staten Island Academy. Describing Yuriy as "nothing short of an exceptional father," Michael relates how until Yuriy's arrest and home confinement, he showed up "at every tennis and tutoring session of J.Z. and every basketball and tennis game of mine" and describes Yuriy's extensive involvement in their daily lives. (Michael Zayonts Letter, Exhibit 8).

In addition to the extremely close ties Yuriy has to his extended family in the New York area, the letters to the Court depict the truly remarkably close ties Yuriy has to the friends of his

---

[4] The letters on behalf of Mr. Zayonts in support of the bail application, several of which are not cited directly in this memorandum, are attached as Exhibits 7-18.

children.

Fourteen year old S.N. writes:

> I would like to say that I have known Yuriy Zayonts since the day I was born. I
> look up to him as my second father. Yuriy is probably the most funniest,
> trustworthy and amazing man that I know today.

(S.N. Letter, Exhibit 9).

S.N. who lives in Philadelphia further writes:

> Yuriy is a very caring man. Whenever I am in need he will be there to help. He
> supports me in everything I do, no matter what it is.

(*Id.*).

S.N.'s sister Jessica writes:

> Yuriy Zayonts has always treated me as if I was his own daughter; he taught me
> how to play almost every sport while helping me to excel in both school and any
> dreams I have ever had.

(Jessica Nabitovsky Letter, Exhibit 10).

Simone Faybyshev, the daughter of family friends of Yuriy states in his letter:

> I would like also to mention what a great friend Yuriy is to my fifteen year-old
> brother, D.F. The two always had such a special bond as my other father has with
> his son. Yuriy even considers him a third son as D.F. considers him a second
> father.

(Simone Faybyshev Letter, Exhibit 11).

Family friend Joseph Shikhman writes:

> I first met Michael Zayonts when he transferred to my middle school seven years
> ago. We quickly became friends, and, very quickly, I began to spend a lot of time
> at his house, spending time with his brother and parents. Through our friendship,
> our parents soon became very close friends in their own right, and over the past
> seven years I have spent more time with Michael's parents than with many people
> in my own family. I have slept over their house, enjoyed countless meals at their
> table, gone on vacation with them, and truly consider them to be my friends as
> well.

(Joseph Shikhman Letter, Exhibit 12).

Anna Skilfas, the daughter of the closest family friends of Yuriy and Irina, writes:

> Yuriy and Irina have been and remain to be our family's closest and dearest friends. Our families have shared many joys and hardships well over fifteen years. I personally consider them my family…It is truly rare to find friendship that withstands time. They are and will always remain part of our family.

(Anna Skilfas Letter, Exhibit 13).

In sum, Yuriy Zayonts' entire world is here in the New York area. He has no ties to the Ukraine from which he emigrated two decades ago. His world is centered on the three generations of close-knit family who live with him and nearby and the exceptionally close friendships he and Irina have developed in their two decades in this country. Flight by Yuriy would destroy this world for him, his wife, their children, their parents and the many other whose emotional ties to him are the essence of his life and would leave his father and brother homeless. The government contention of flight risk is baseless.

    4.  <u>Nature and Seriousness of Danger to the Community</u>

Finally, as discussed in Section C under "Legal Standards and Authority," *supra* at pp. 8-9, the government cannot show any "economic danger" to the community from Mr. Zayonts.

**B. Michael Kremerman**

Michael Kremerman poses neither a threat of danger to the community nor a risk of flight to the Court. Indeed, the Pretrial Services Office recommended that he be released on a personal recognizance bond, cosigned by three financially responsible persons – without any condition of home confinement or electronic monitoring. With respect to the issue of danger, he has lived in the United States for nearly twenty years, including as a citizen since 2002, and at no point, with the exception of the present charges, has he had even a single run-in with the law. He lives with

his wife and two children, as part of a stable and loving family, in a modest residential

neighborhood in Staten Island, and it is difficult to see how anyone could possibly be endangered

by allowing him to remain at liberty.  The government does not suggest that he has any violent

propensities, nor does it point to any form of harmful misconduct in which he is likely to engage

other than the economic offenses alleged in the Indictment.  Significantly, the return of the

Indictment and related searches and seizures conducted by the government have eliminated his

ability to engage in the alleged offense activity.  Thus, the prospect of any continuing economic

harm – a category of "danger" already of limited significance under the bail statute, *see supra* at

pp. 8-9 – is *de minimis* here.

 With respect to risk of flight, the government presents no specific facts to suggest that

Mr. Kremerman might flee.  Its argument rests on the generic presumption that a foreign-born

individual facing a potentially high sentence is likely to flee.  But the bail statute creates such

generic presumptions only for offenses involving drugs or violence, 18 U.S.C. § 31429(f)(1), and

requires a more searching inquiry in all other cases, considering not simply the defendant's place

of birth, but the level of his integration and involvement in his current community.

 Here, the facts make plain that Michael Kremerman is fully and irrevocably domiciled in

the United States and is anything but a risk of flight.  Although he was born in the Ukraine, he

has no remaining ties to that region: none of his relatives live there, nor does he maintain any

property or financial assets there.  By contrast, three generations of his family are now fully

based in New York.  Beyond himself and his wife who have lived in New York since 1994, he

has a son and daughter who have lived in New York their entire lives.  His son is enrolled in a

local elementary school and his daughter will begin college in Brooklyn in the fall.  In addition,

Mr. Kremerman's father – a United States citizen with no criminal record – has lived in

Brooklyn since 1995 (Mr. Kremerman's mother, who was also a United States citizen, is deceased). Indeed, all of Mr. Kremerman's relatives – his entire extended family – are now based in New York or elsewhere in the United States. Because the number of Mr. Kremerman's United States-based relatives is so large, we have listed them in an appendix attached hereto. (Exhibit 19).

It is fanciful to believe that Mr. Kremerman would leave his entire family behind, including his wife and children, to depart for a country where he has no family, property or any other ties. Since coming to the United States, he has never returned to the Ukraine with the exception of six days in 2008 as part of a larger vacation trip in which he and his wife also traveled elsewhere in Europe. He has owned and resided at his current New York address for more than ten years.

Moreover, since his arrest, Mr. Kremerman has dutifully and punctually made all of his court appearances and all of his scheduled meetings with his pretrial services officer. Similarly, when granted permission to leave his home, he has made numerous trips to his attorney's office and numerous trips to his current job as a salesman at an interior design store in Brooklyn – all without incident. His conduct shows that he is conscientious and responsible, and committed to working with his lawyers to prepare his defense. Yes, he was born in the Ukraine, and, yes, the charges in this case are significant, but when one considers his actual circumstances and his overwhelming ties to New York – none of which are mentioned in the government's detention memorandum – it is clear that his situation is not one that cries out for the severe constraint of home confinement with electronic monitoring.

Rabbi David Okonov describes Michael Kremerman as a "valuable member" of the community. He has known Michael for years and considers him to be a "very caring person"

and "always the first one to react" when someone has trouble or problems. He notes that

Michael has touched lots of people's lives with "warmth and kindness." (Exhibit 20).

Michael's other friends attest to his devotion to his family and to the difficulty that home

detention has caused, particularly when it comes to events involving his children. Daniella

Mizhericher, a friend of family, describes how Michael's daughter has had to take responsibility

for attending some of her younger brother's events at school, because Michael could not attend.

She notes that Michael's son, who is eight years old, often asks "Why didn't dad come?"

(Exhibit 21). Rachel Faybyshev, Slava Faybyshev, and Marina Malumud, all of whom have

known Michael for years, also speak of his strong commitment to his family and of the strain on

his children that his home confinement has caused. (Exhibits 22, 23, & 24).

Eugene Kosse, Michael's friend of eighteen years, describes Michael "as a wonderful

father and husband." He notes that Michael's home confinement has put "tremendous pressure"

on Michael's wife, Yana, because she has to juggle by herself all of the children's needs.

(Exhibit 25). Alice Azen, Michael's friend for fourteen years, describes him as "very dedicated

to everyone in his life" and as someone who "extends himself beyond the call of friendship."

She writes that "[h]e always takes an interest in the lives of people that surround him and their

families." (Exhibit 26).

These many letters from friends testify to Michael's strong and extensive ties to his New

York community. His whole life is here, and it is full of meaningful relationships and deep

personal bonds. It is unrealistic to think that he would abandon his wife, children, father and so

many close friends and members of his family to return to a country that he knew only in his

youth. He presents no risk of flight. Nor, as discussed in Section C, under "Legal Standards and

Authority" *supra* at pp. 8-9, can the government show any "economic danger" to the community that would result from the removal of home confinement.

### C. Vladislav Zaretskiy

Vladislav Zaretskiy, 40 years old, is a father of two young daughters, ages 5 and 11; has no prior arrest record; is a United States citizen; has his entire family residing in the New York area; has lived in the United States for nearly 20 years; attended Hunter College in New York; has maintained employment throughout his adult life; has retained counsel and intends to defend the fraud allegations made against him; and has an unblemished record on bail over the last four months.  He is not a flight risk, and home detention with electronic monitoring is not a condition narrowly tailored to ameliorate either flight risk or any alleged "economic danger" to the safety of the community.  Accordingly, this condition should be removed.

1.  <u>Mr. Zaretskiy's Family Ties Are All in New York and He Has Made His Home Here Since Age 21</u>

While foreign born, Mr. Zaretskiy came to the United States with his parents and sister in 1994, when he just turned 22 years old.  He is a naturalized United States citizen.  He was born a citizen of the former Soviet Union, in what is now the free Republic of the Ukraine.  He has no passport or other legal document giving him citizenship or any other legal residency rights in any country other than the United States.  In effect, he was born into a country that no longer exists. He maintains no ties in the Ukraine; he has no known family there.  He has traveled there only once in the last 20 years, and then only out of curiosity of the land his family left behind.  He and his wife, Alina, traveled to the Ukraine last year on vacation.  He stayed in hotels and traveled as a tourist.  He is an American with all of his ties in this country.

In fact, all of the family members with whom Mr. Zaretskiy has any relationship reside here in New York.  They are:

1.     His parents:  Alex and Irina Zaretskiy, who brought their son and daughter to this country in 1993.  They continue to work and live in Brooklyn.

2.     His sister:  Tatyana Feldman.  She is married, has a 2-year-old daughter, and works and lives in Brooklyn with her family.

3.     His grandparents (on his father's side):  Yefim and Sara Zaretskiy.  They also immigrated to the United States in 1993.  Both are retired and live in Brooklyn.

4.     His grandmother (on his mother's side):  Elizaveta Aptecar.  She immigrated with the rest of his family to the United States in 1993.  She also is retired and lives in Brooklyn.

5.     His uncle and aunt:  Victor and Julia Zaretskiy.  They immigrated to the United States in 1989.  They reside in Staten Island with their daughter and two grandchildren.

6.     His wife:  Alina Kremerman.  She immigrated to the United States with her family in 1995, and is the sister of co-defendant Michael Kremerman.

7.     His father-in-law:  Vladimir Kremerman.  He immigrated to the United States in 1995, and is retired and lives in Brooklyn.

8.     His wife's brother and his wife:  Michael Kremerman (co-defendant in this case) and Yana Soskil.  They immigrated to United States in 1994, and now live in Staten Island with their two children.

9.     His wife's uncle and aunt:  Leonid and Zinaida Lozovskiy.  They immigrated to United States in 1979.  They are retired and live half of the year in Queens, New York and the other half in Florida.  They have two children and four grandchildren.

10.    His wife's cousin and her husband: Inna and Maksim Solntsev. They immigrated

to the United States in 1995, and live in Brooklyn with their daughter.

When Mr. Zaretskiy first arrived with his family in the United States, he immediately

devoted himself to the task of learning English and sought a skill that he could quickly translate

into employment. He registered at Hunter College in 1994, where he took courses in English as

a Second Language and majored in computer programming.

Mr. Zaretskiy's younger sister, Tatyana Feldman, wrote the Court to provide some insight

on the character of her brother and the early hardships they shared as young immigrants in a new

land:

> I always knew I was a lucky woman having an older brother by
> my side. However, I realized this even more when my family and
> I first came to this country. Our family immigrated to the United
> States of America in December of 1993 when I was just 11 years
> old. At that point I was too young to recognize the effect the move
> had on my parents and my brother so I can only relay my own
> memories. A few weeks after we had arrived, I started sixth grade
> at a junior high school. I did not speak a word of English, feeling
> completely lost in class and among my peers. I felt embarrassed
> and self-conscious and I used come home and cry. My brother
> always reassured me that everything will turn out for the best.
> Although his knowledge of English was also not great, he tried his
> best to help me with my homework and any projects that I was
> assigned. Vladislav attended college full time and worked a part
> time job, yet he still made time for me. Since our parents worked
> long hours and I was not even a teenager yet, my brother made
> sure that I was well taken care of and arranged his schedule to
> make time for me.

(Letter of Tatyana Feldman, Exhibit 27.)[5]

Mr. Zaretskiy was not daunted by his new home and surroundings. He learned that

working hard and persevering were very American traits and – along with the country – he

adopted them as his own. He quickly learned two new languages: English and computer

---

[5] The letters written on behalf of Mr. Zaretskiy, including a letter not directly cited in this memorandum, are
attached as Exhibits 27 – 31.

programming.  While still at Hunter College, he applied for jobs writing programming source code.  He worked for a company called Trade One Marketing in 1997-1998.  He then got a job at the financial services firm, Paine Webber, where he wrote software code for three years.  After completing his projects there, he went on to work several years at the Bank of New York and Citigroup as a computer programmer.

    2.    <u>Mr. Zaretskiy's Devotion to the Welfare of His Young Daughters and Their Future in the United States is Strong Evidence Against Flight Risk</u>

While Mr. Zaretskiy improved his financial standing with this new employment, he also got married and started a family.  He married Alina Kremerman and soon they had two children together.  Ms. Kremerman wrote the Court about her husband:

> Vladislav is [my] wonderful husband; he is such a respectful, loyal, loving man.  I know that because we've been together for almost 14 years and have 2 beautiful daughters together.  He was always a hard worker and a great provider for his family. . . .

(Letter of Alina Kremerman, Exhibit 28.)

Mr. Zaretskiy took to being a father like he was a big brother to his sister, Tatyana.  He is a hands-on father who believes in being immersed in all aspects of his daughters' lives.  His daughters are now ages 11 (B.Z.) and 5 (E.Z.), and Mr. Zaretskiy is their guiding hand.  The Court need not rely only on the words of his immediate family to understand his devotion to family, because it also has the insights of Mr. Zaretskiy's neighbors and close friends, Lana and David Modnyy.  They wrote to the Court:

> Vlad is an excellent father; he is involved in every second of his children's lives:  picking them up from school, taking them to activities, helping them with homework or simply going to the park.  He has never denied of doing anything for his family. . . .
>
> As far as being an excellent husband, Vlad and his wife always did everything together.

(Letter of Lana and David Modnyy, Exhibit 29.)

Mr. Zaretskiy, Alina, and their two daughters are an extremely close and strong family. They live in Staten Island, where the two girls attend school. Just last month the Court authorized Mr. Zaretskiy to attend the school closing ceremonies of both his daughters. B.Z. graduated P.S. 52 in Staten Island and will be matriculating next year at Mark Twain I.S. 239 in Brooklyn, a New York City magnet school. B.Z. is already an accomplished dancer who competes in national contemporary dance competitions. Regrettably, Mr. Zaretskiy missed her most recent national recital in Baltimore, Maryland because of his arrest in this case. He was denied authorization to attend B.Z.'s competition because of his bail restrictions here. Mr. Zaretskiy never missed a dance recital or performance by his daughter before. His wife explained:

> When our older daughter [B.Z.] became a champion of America in ballroom dancing in Baltimore, Vladislav was not there to celebrate her success with her and it was very hard for me to explain to her why her father was not there.

(Letter of Alina Kremerman, Exhibit 28.)

As to his youngest daughter, E.Z., Mr. Zaretskiy now misses "go[ing] to Toys R Us or movie theater[s] like they always did." (*Id.*) However, he was able to attend, with the Court's permission (Dkt. No. 267), E.Z.'s pre-school class "graduation." E.Z. is excited to be escorted by her father to her first day of kindergarten at P.S. 52 in the fall. Mr. Zaretskiy intends to be there.

This summer, Mr. Zaretskiy has taken B.Z. to summer camp (with the Court's authorization, over the government's objection, Dkt. No. 281), and was there for parents' visiting day (again, with Court authority, again over the government's objection, Dkt. No. 291). These events are very important to Mr. Zaretskiy and his children. They expect him to be there because

he always has been in the past. *See* Modnyy Letter, Exhibit 29 ("[Vlad's daughters] are just so used to him being everywhere in their lives.").

This dedication to family – and especially his young daughters – is why the government's claim that Mr. Zaretskiy is a flight risk is wholly without merit. Mr. Zaretskiy's entire meaning in life is in New York with his family and children. And their life is rooted here. Alina, B.Z. and E.Z. are at home in New York and know no other place where they can call home. The grandparents are here, aunts and uncles and cousins live here. There is no place for them to go and still have family around them. In addition to family ties, Mr. Zaretskiy's older daughter already has made lasting friendships through school and dance that he would never consider jeopardizing. The Modnyy family explains the relationships and bonds that are inevitably formed by children with their environment: "Besides being dance partners, our older children are best friends with each other from the day they were born." (*Id.*)

Mr. Zaretskiy would never cause his family the pain or suffering of traumatic upheaval. He is an immigrant who intensely knows the feeling of being uprooted as a young person and suddenly thrust into a distant and foreign place, but even he had the loving support of family around him at all times. Mr. Zaretskiy would not cause his family to be torn apart by his flight. He has no place to go and less desire to leave his precious daughters behind. His current situation as a defendant in a criminal case makes Mr. Zaretskiy only more aware of the special moments he has with his children, who depend entirely on him for strength and support. *See* Letter of Lana and David Modnyy, Exhibit 29: "There are just so many things that [Vlad] is missing out on [by being restricted to his home over the last several months], that you cannot bring back. And it hurts [him] to see how kids are suffering and always looking for him on all

these types of occasions.  Because they are just so used to him being everywhere in their lives. . . . His kids mean the world to him!"

Mr. Zaretskiy's devotion to his young family and the harm he would cause them by failing to comply with his bail conditions carries heavy moral suasion with Mr. Zaretskiy and reasonably assures that he represents no flight risk during the pendency of this case.  *See United States v. Vaccaro*, 51 F.3d 189 (9th Cir. 1995) (finding great moral suasion when family loss is implicated by failing to comply with bail); *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v Terrell*, 983 F.2d 653 (5th Cir. 1993); *United States v. Santiago*, 826 F.2d 499 (7th Cir. 1987) (collectively holding the same).  Home detention with electronic monitoring does not measurably add anything to this calculus.  Under these facts, this condition is excessive and unnecessary.

### 3.  In Mr. Zaretskiy's Case, The Condition of Home Detention is Punitive and Does Not Measurably Ameliorate the Concern of Flight Risk

With Mr. Zaretskiy's background, home detention begins to look punitive despite the constitutional and statutory presumptions of innocence.  *See* 18 U.S.C. § 3142(j).  Indeed, this punishment is not limited to Mr. Zaretskiy, but extends to his young family as well.  Alina Kremerman explains:

> This has been very hard for me too.  My husband has always helped me with everything, especially taking our young daughters to all their activities, and extremely hard for me to take over both roles.  Our children and I need him to be able to play an active role in our lives again, like he always has.

(Letter from Alina Kremerman, Exhibit 28.)

While not ameliorating any credible risk of flight, the bail condition of home detention has prevented Mr. Zaretskiy from performing his family duties:  taking the children to their classes, sports, and dance activities, running store errands for the family, giving his wife a break from the children, attending family events, or repairing the car.  These simple tasks may seem small, but when months and months pass by and you cannot assist your own family, the toll is felt by all.  As the Modnyy family observed:  "Vlad always helped with the food shopping, took care of the house, dropped kids to and from activities, etc.  And no[w] seeing his wife ripping herself apart to be a mother and a father, so that the children would not feel for a second that their lives were affected.  Unfortunately, they don't have anybody to help them.  So she needs to do everything herself and it is very hard!  I see her struggling . . ." (Modnyy Letter, Exhibit 29.)

Home detention also does not measurably reduce the opportunities for flight even if Mr. Zaretskiy were so inclined.  Currently, Mr. Zaretskiy works three days per week[6] (six hours per day for a total of 18 hours); he attends legal meetings on an average of once per week (six hours); he attends religious services (four hours per week); and is permitted on occasion to attend special family events (birthday parties, school and summer camp events).  Conservatively, Mr. Zaretskiy spends roughly 28 hours per week already outside of his home.  He has been on bail for over four months.  That means he already has had a total of over 532 hours not being monitored in his home.  The additional hours that Mr. Zaretskiy is confined to his home do not act as a greater deterrence against flight, they only contribute to his delinquency in fulfilling his obligations as a husband and father to his family.

Finally, as discussed in Section C under "Legal Standards and Authority," *supra* at pp. 8-9, the government cannot show any "economic danger" to the community from Mr. Zaretskiy.

---

[6]       While on bail, Mr. Zaretskiy found employment as a sales agent for an automobile leasing company. *See* Letter from Serge Gayetsky, Infinite Leasing, Exhibit 30 (offering Mr. Zaretskiy employment as an entry level sales consultant).

## CONCLUSION

For the forgoing reasons, Messrs. Zayonts, Kremerman, and Zaretskiy respectfully submit that their bail conditions should be modified to remove the condition of home confinement with electronic monitoring.

COOLEY LLP

_____S/S_____
Jonathan Bach (JB9710)
Michael A. Blasie (MB6569)
1114 Avenue of the Americas
New York, New York 10036
(t) 212.479.6000
(f) 212.479.6275
Attorneys for Defendant
*Michael Kremerman*

HAFETZ NECHELES & ROCCO

Frederick P. Hafetz (FH1219)
Noah E. Shelanski (NS4800)
500 5th Avenue, 29th Floor
New York, NY 10110
(t)(212) 997-7595
(f) (212) 997-7646
Attorneys for Defendant
*Yuriy Zayonts*

CLAYMAN & ROSENBERG LLP

_____S/S_____
Henry Mazurek (HM5208)
305 Madison Avenue
New York, NY 10165
(t) 212.922.1080
(f) 212.949.8255
Attorney for Defendant
*Vladislav Zaretskiy*