UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -v- | : | S1 12 Cr. 171 (JPO) |
| YURI ZAYONTS, MIKHAIL KREMERMAN, and VLADISLAV ZARETSKIY, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR MODIFICATION OF BAIL CONDITIONS

The Government respectfully submits this memorandum in opposition to the motion of Yuri Zayonts, Mikhail Kremerman, and Vladislav Zaretskiy (the "Defendants") to modify their bail conditions by simply eliminating the bail condition of home detention with electronic monitoring.  The Defendants' motion should be denied.  First, the Defendants seek to breach a negotiated agreement with the Government and modify conditions of release that they presented to the Court without identifying any changed circumstances that would warrant the modification.  Second, the relevant bail factors establish that the current conditions of release are appropriate and necessary to insure the Defendants' presence at future court appearances.

**I.      Background**

The Defendants were each arrested on February 29, 2012, on charges in Indictment S1 12 Cr. 171 (JPO) ("Indictment").  The Indictment charges Zayonts and Kremerman in four counts and Zaretskiy in three counts: Count One charges Zayonts and Kremerman with racketeering conspiracy, in which the enterprise – the "No-Fault Organization" – engaged in a pattern of racketeering of mail fraud and money laundering as part of a

widespread and massive scheme to defraud insurance companies of hundreds of millions of dollars under New York's no-fault insurance law, and then to launder the proceeds of that scheme through structuring, shell companies, and check cashers. Counts Two and Three charge the Defendants with conspiracy to commit health care fraud and conspiracy to commit mail fraud in connection with the no-fault insurance scheme. Count Four charges the Defendants with money laundering, both by reinvesting the proceeds of the no-fault insurance scheme back into the scheme and by concealing the source of the proceeds in order to extract profits from the scheme without alerting the insurance companies. At the time of the Defendants' arrest, the Government estimated that the intended loss for all of the medical clinics associated with the Defendants' no-fault scheme was more than $279 million and the actual loss to the insurance companies was more than $113 million. Upon further investigation since the Defendants' arrest, the Government now estimates that the intended loss was more than $400 million and the actual loss was more than $160 million. As discussed in greater detail below, all three Defendants face a Guidelines range of life imprisonment if convicted of the charges against them.

The Defendants were presented and arraigned on February 29, 2012, by United States Magistrate Judge Theodore H. Katz. In connection with the arraignment, the Government filed a motion seeking pretrial detention of Zayonts, Kremerman, and three others pursuant to 18 U.S.C. § 3142 based on risk of flight and danger to the community. At the arraignment, the Government and Zaretskiy reached an agreement with respect to conditions of release, which were then jointly proposed to Judge Katz, who approved them. The agreed-upon bail conditions for Zaretskiy were: (1) home detention with electronic monitoring; (2) $2 million personal recognizance bond secured by $50,000 cash or property and two financially responsible co-

signors; (3) strict pre-trial supervision; (4) no new work or business related to medical clinics; and (5) standard conditions of release.

Zayonts and Kremerman were detained on consent on February 29, 2012. Zayonts and Kremerman each subsequently reached an agreement the Government with respect to conditions of release, which were then jointly proposed to Judge Katz, who approved them. The agreed upon bail conditions for Zayonts and Kremerman were: (1) home detention with electronic monitoring; (2) $2.5 million personal recognizance bond secured by $50,000 cash, $250,000 property and three financially responsible co-signors; (3) strict pre-trial supervision; (4) no new work or business related to medical clinics; (5) no opening of new accounts without approval; (6) no contact with co-defendants; (7) drug testing and drug treatment as necessary; and (8) standard conditions of release.

## II.     Applicable Law

Title 18 United States Code, Section 3142(c) provides that a judicial officer may set conditions of release that are deemed necessary to "reasonably assure the appearance of the [defendant] as required and . . . the safety of any other person and the community." The Bail Reform Act lists four factors relevant to this analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

## III.    Argument

The Defendants' motion should be denied. First, the Defendants seek to breach an agreement between the parties with respect to bail conditions that was jointly presented to,

and approved by, a magistrate judge, without pointing to any change in circumstances that would justify the change.  Second, the condition of home detention with electronic monitoring is necessary to overcome the substantial risk of flight posed by the Defendants.  All three are facing severe possible prison sentences in a case where the Government's evidence is strong (and getting stronger), providing the defendants with an obvious and compelling incentive to flee.  Moreover, the Defendants have the capacity to flee: they have significant ties to a foreign country that does not have an extradition treaty with the United States and, before their arrest, engaged in a profitable scheme that generated significant amounts of cash.

### A.   There Are No Changed Circumstances That Warrant Disturbing the Current Bail Conditions

The Defendants' motion is not, as they claim, an "initial bail application."  Instead, as discussed above, the Defendants' initial bail applications were made when the current conditions of release were presented to the Court by both parties, and were then considered and approved by a judge.[1]  Because the current bail conditions were the product of the Defendants' own motion and because they have successfully fulfilled the purposes of the Bail Reform Act to date, they should not be disturbed absent some showing by the defendants of a change in circumstances.  *Cf. United States* v. *Orena,* 986 F.2d 628, 630 (2d Cir. 1993) ("We do not agree that the postponement of trial dates constitutes a new circumstance justifying release under the Bail Reform Act.").

---

[1]   The Defendants, who now complain that the Government "wielded a meat ax rather than a scalpel in fashioning" the currently bail conditions, (Def. Mot. 1), ignore the fact that the current conditions of release were jointly proposed to the Court after the parties reached an agreement that included the Government withdrawing its motion for detention as to Zayonts and Kremerman.

The Defendants have not identified any change of circumstances at all, much less changes that would warrant modification of their bail. The factors that they argue support their motion — lack of criminal history and ties to the community — were all present when the current bail conditions were imposed upon their consent.[2] Nor have the Defendants identified any significant hardships that have resulted from being on home detention. The Defendants are able to work and attend meetings with their lawyers. The Defendants have been able to maintain the connection to their friends and family, who, as the Defendants stress, all live in the New York area and, presumably, are available to assist the Defendants' families with routine household and child care matters, in addition to regular visits. In addition, the Court has further eased the burden of the bail conditions by repeatedly granting temporary bail modifications that have allowed the Defendants to attend events held outside the home, many of a social or recreational nature.[3]

Finally, the Defendants should not lightly be allowed to withdraw from an agreement with another party. Parties in criminal cases regularly resolve the issue of bail conditions, among other issues, through good faith negotiation. A central premise of those negotiations for both parties is the promise of finality — defendants assume that if they reach

---

[2]   The fact that the Defendants have abided by their bail conditions is not a "changed circumstance" sufficient to warrant a modification of their bail. It simply shows the conditions are working. Moreover, such an argument would apply to nearly any defendant who is bailed in nearly every case.

[3]   The Court has granted many requests over the objection of the Government and the Pretrial Services Department. Some of these requests include lengthy, day-long trips, which are not consistent with the policies and requirements of home detention. According to the home detention policy of the Pretrial Services Department, only the most essential and necessary outside activities, such as work, school, and medical and religious requirements, are grounds for authorizing the Defendants' to leave the home.

agreement on conditions of release that those conditions will not be disturbed unless something changes, and the Government does the same.  The incentives for parties to try to reach those agreements on bail, as well as on other issues, would be undercut if those agreements were only honored so long as both parties continued to be happy with the agreement.  Moreover, here, the Defendants' consent to the current bail conditions was provided on the condition that the Government either withdraw its motion for detention as to Zayonts and Kremerman, or that the Government would not seek detention as to Zaretskiy.  The Government respectfully submits that the Court should not countenance a request for modification of an agreement of the parties based solely on the same set of facts and circumstances that existed at the time the agreement was made.[4]

### B. Home Detention with Electronic Monitoring is Necessary to Assure the Defendants' Appearance As Required

Even if the Court were to consider the merits of the Defendants' motion, notwithstanding the lack of any changed circumstances, the condition of home detention with electronic monitoring is necessary to ensure the appearance of the Defendants as required.[5]  The Defendants have strong incentives to flee, the capacity to do so, and an obvious destination which would shield them from future prosecution.  The Defendants therefore present a significant risk of flight and require home detention with electronic monitoring to ensure that

---

[4] The Government understands that all three of the Defendants have different counsel now than they had when they entered into the original bail agreements.  Change of counsel, however, does not alter a prior agreement between a defendant and the Government.

[5] While home detention with electronic monitoring also helps to assure the safety of the community by helping to prevent the Defendants from committing additional frauds, the Government concedes that other combinations of conditions can accomplish that objective.

they will appear as directed.

Yuri Zayonts and Mikhail Kremerman were leaders of an operating branch of the No-Fault Organization. Together, they controlled No-Fault Clinics in Brooklyn, Manhattan and the Bronx, as well as numerous Modality Clinics (primarily neurology) and a billing and collection company that helped facilitated the widespread fraud charged in the Indictment. Vladislav Zaretskiy was the chief lieutenant of Zayonts and Kremerman and was instrumental in operating their various clinics.

All three defendants face substantial terms of imprisonment. Zayonts and Kremerman, who are charged in all four counts in the Indictment face up to 70 years' imprisonment. Zaretskiy, who is charged in three of the four counts, faces up to 50 years' imprisonment. As set forth in the Government's motion for detention, both Zayonts and Kremerman face a Guidelines Range of life if convicted of racketeering or mail or health care fraud.[6] So too would Zaretskiy, who was involved in every aspect of Zayonts' and Kremerman's operations.[7] These possible sentences create a strong incentive to flee. As the Defendants note,

---

[6] Under § 2B1.1 of the Guidelines, the base offense level for Zayonts and Kremerman would be 7, pursuant to § 2B1.1(a)(1), because the offense of conviction has a maximum term of imprisonment of 20 years; there would be a 30-level enhancement, pursuant to § 2B1.1(b)(1)(P), because, as mentioned above, the entire intended loss of the scheme ($400 million) was reasonably foreseeable to them; there would be a 2-level enhancement, pursuant to § 2B1.1(b)(2)(A), because the offense involved more than 10 victims; there would be 2-level enhancement because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10); and there would be a 4-level enhancement because they were leaders of the organization, pursuant to §3B1.1(a). As a result the total offense level would 45 (which is treated as level 43), § 5A n.2, resulting in a Guidelines Range of life imprisonment.

[7] Under § 2B1.1 of the Guidelines, the base offense level for Zaretskiy would be 7, pursuant to § 2B1.1(a)(1), because the offense of conviction has a maximum term of imprisonment of 20 years; there would be a 30-level enhancement, pursuant to § 2B1.1(b)(1)(P), because, as mentioned above, the entire intended loss of the scheme (more than $400 million)

none of them have ever spent any time in prison. The possibility of spending a significant portion of the rest of their life in jail creates incentives that could easily outweigh the various factors that would assure they would stay in New York.

As set forth in the Government's Detention Motion, the evidence against the Defendants is strong, and includes (1) testimony from multiple cooperating witnesses; (2) incriminating consensual recordings with all three Defendants; (3) consensual recordings of co-conspirators in which one of their No-Fault Doctors acknowledges that the doctor is, in fact, a paid employee and does not control the clinic; and (4) financial records demonstrating their control over Modality and No-Fault Medical Clinics and the laundering of the proceeds of those clinics through check cashers and shell companies, which ultimately were used to pay for extravagant personal expenses. In fact, the evidence against the defendants has improved since the current bail conditions were imposed. Among other things, including the seizure from their billing and collections company signature stamps in the name of straw doctors who incorporated their clinics, the Government has identified additional witnesses who dealt directly with the Defendants in committing the fraud. Those witnesses will testify about the extent of the Defendants' leadership of their medical clinics and their knowledge of the fraud that was perpetrated through those clinics.

In addition to the strong incentives to flee created by the strength of the evidence and the potential punishments they face, the Defendants have an obvious and attractive possible

---

was reasonably foreseeable to him; there would be a 2-level enhancement, pursuant to § 2B1.1(b)(2)(A), because the offense involved more than 10 victims; there would be 2-level enhancement because the offense involved sophisticated means, pursuant to § 2B1.1(b)(10); and there would be a 3-level enhancement pursuant to §3B1.1(a) because Zaretskiy was an organizer of a supervisor of the organization. As a result the total offense level would 44 (which is treated as level 43), § 5A n.2, resulting in a Guidelines Range of life imprisonment.

destination to which to flee — Ukraine. The Defendants were all born and raised in the Ukraine, have visited Ukraine in the past four years, speak fluent Russian, and are undoubtedly aware that the United States does not have extradition treaty with the Ukraine. And the Defendants have the wherewithal to flee. The Defendants' scheme generated large amounts of cash both through the laundering of checks from insurance companies and through the cash kickbacks that the medical clinic controller would receive from modalities in return for the medical clinics supplying the modalities with patients. The Government's efforts to seize funds belonging to the Defendants upon their arrest did not prove fruitful; accordingly, there is every reason to believe that the Defendants retained cash proceeds from their criminal activities and that they continue to have access to that money – some of which they have likely hidden from law enforcement. Those funds could be used to fund a possible flight and also could be moved overseas to support the Defendants after they flee.

      The Defendants principally argue that their connection to the community, particularly the presence of family members in the New York area, is a sufficient incentive to ensure that the defendants will not flee. (Def. Mot. 9). This argument fails. The Defendants are cognizant of the overwhelming likelihood that they will be separated from their loved ones in the United States, through a significant term of imprisonment, if the Defendants do not flee. Moreover, the Government is not aware of any significant economic ties to the United States of the Defendants' family members, such as a job or career that would prevent them from traveling to a different country to be with the Defendants after fleeing to avoid a lengthy jail sentence. In fact, the Government's evidence has revealed that at least one of the Defendants' wives was involved in the fraud scheme charged in the Indictment. Thus, the Defendants' (and their families') ties to the community, by themselves, are insufficient to ensure that the Defendants

9

appear as directed.[8]

In sum, the Defendants are a flight risk. They are facing the possibility of spending the rest of their lives in prison; they have an obvious destination to which they can flee; and they have the ability to do so through the proceeds of their crime. Accordingly, the Government respectfully submits that the current bail conditions, including home detention with electronic monitoring, are necessary and are the least restrictive conditions that will reasonably assure the Defendants' appearance as required.

---

[8] The Defendants' comparison with bail conditions *United States* v. *Chervin,* 10 Cr. 919 (RPP), is also unavailing. While there is no question that the charges in the two cases involve fraudulent schemes relating to New York's no-fault insurance laws, the scope and nature of the alleged crimes are significantly different. The intended loss amount in this case is four times larger and RICO was not charged in the *Chervin* case; in fact, as the Court is aware, this is the largest no-fault insurance fraud case in history. Moreover, the evidence in this case is substantially stronger than in the *Chervin* case. The Defendants in this case are also higher on the ladder than nearly all of the defendants in the *Chervin* case, and therefore profited more significantly from the scheme. In addition, nearly all of the defendants in the *Chervin* case had no substantial ties to foreign countries with no extradition treaty with the United States.

## IV. Conclusion

For all of the foregoing reasons, the Defendants' motion to modify the current conditions of release should be denied.

        Respectfully submitted,

        PREET BHARARA
        United States Attorney
        Southern District of New York

By:    /s/
        Daniel S. Goldman
        Nicholas L. McQuaid
        Jason H. Cowley
        Carolina A. Fornos
        Assistant United States Attorneys
        (212) 637-2200